UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, THE STATES OF DELAWARE, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MONTANA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, WISCONSIN, and THE DISTRICT OF COLUMBIA *ex rel.* NPT ASSOCIATES, | : | *11-17-15* |
| | : | |
| | : | |
| | : | |
| | : | 1:07-cv-05696 (ALC) (RLE) |
| | : | |
| | : | **OPINION AND ORDER** |
| **Plaintiff-Relator,** | : | |
| | : | |
| -against- | : | |
| | : | |
| LABORATORY CORPORATION OF AMERICA HOLDINGS and XYZ CORPORATIONS 1-100, | : | |
| | : | |
| **Defendant.** | : | |

-----------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff-Relator NPT Associates ("NPT" or "Relator") brought this qui tam action

against Defendant Laboratory Corporation of America Holdings ("LabCorp"), on behalf of the

United States of America, as well as the States of Delaware, Hawaii, Illinois, Indiana, Louisiana,

Montana, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Rhode Island,

Tennessee, and Wisconsin, and the District of Columbia (the "States"), alleging that LabCorp

violated the Federal Civil False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA") and its state

equivalent laws ("State FCA laws") by (1) giving "kickbacks" to private insurance companies in

1

the form of discounted lab testing rates and (2) charging Medicare and Medicaid programs prices "substantially in excess" of the prices it charges said private insurers.  LabCorp now moves for dismissal of all claims pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).  For the reasons set forth below, Defendant LabCorp's Motion to Dismiss (ECF No. 79) is GRANTED.

BACKGROUND

## I.      Factual Background

The following facts, alleged in the Third Amended Complaint ("TAC"), are assumed to be true for the purposes of this motion. The allegations are based on the direct and personal knowledge of a former LabCorp sales executive who is now a member of NPT. (TAC ¶ 19.)

LabCorp is a clinical laboratory company with annual revenues of over $5.7 billion. (TAC ¶ 21-23.) Between 2003 and 2013, LabCorp was paid more than $5 billion by Medicare and Medicaid (collectively, the "Government Programs"). (TAC ¶ 13.) Government Program business is particularly sought after in the laboratory testing industry, as the Programs provide generous reimbursement, and pay more quickly and efficiently and dispute fewer claims than private insurance programs ("Private Programs"). (TAC ¶ 4.) NPT alleges that LabCorp carried out a scheme under which it struck "fraudulent bargains" with numerous Private Programs in order to increase its Government Program business. (TAC ¶¶ 6, 49.)

The scheme had six basic steps. (TAC ¶ 49.) First, LabCorp and the Private Program would enter into an agreement under which LabCorp would serve as the exclusive or preferred provider for patients insured by the private program, in exchange for LabCorp agreeing to discount the price of tests for those patients. (TAC ¶ 50.) The discounted prices were below the amount the Government Programs paid for the same tests. (TAC ¶ 51.) The Private Program would "agree to use its influence over in-network doctors to help LabCorp obtain" business from

the Government Program-covered patients of those in-network doctors. (TAC ¶ 50.) Second, LabCorp and the Private Program would execute their agreement; the executed agreement would reflect the exclusivity or preferentiality in exchange for heavily discounted pricing but would not contain "the illegal side agreement under which the Private Program agreed to use its influence overs its in-network doctors to help LabCorp obtain 'pull-through' business." (TAC ¶ 53.)

Third, representatives of LabCorp and the Private Program would inform in-network doctors of the agreement and explain that these doctors were required to send all Private Program patients to LabCorp. (TAC ¶ 54.) Fourth, LabCorp tracked the number of Government Program patient referrals it received from in-network doctors and shared with the Private Programs information about which in-network doctors were not sending LabCorp the amount of "'pull-through' business it needed to profit from the fraudulent arrangement." (TAC ¶ 57.) Using that information, at the fifth step, the Private Program would contact in-network doctors who were falling short "and recommend that they use LabCorp for all testing (including testing for Government Program Patients). These recommendations [were] induced by the deep discounts provided by LabCorp." (TAC ¶ 58.) Doctors would adhere to that recommendation as they valued their in-network status. (TAC ¶ 59.) As the sixth and final step, LabCorp billed the Government Programs for the patients sent to it by these doctors, at rates substantially in excess of the rates billed to Private Programs. (TAC ¶ 60.)

Beginning in 2007, LabCorp carried out this scheme with UnitedHealth Group Incorporated ("UHC" or "UnitedHealthcare"). (TAC ¶ 63.) LabCorp agreed to provide testing services to UHC at below-cost prices that were 70 to 80 percent less than it charged Government Programs. (TAC ¶¶ 64, 66.) In addition, LabCorp agreed to pay UHC up to $200 million over three years for transition costs. (TAC ¶ 69.) While neither party publicly disclosed "the illegal

side agreement under which UnitedHealthcare agreed to help LabCorp obtain 'pull-through' business from UnitedHealthcare's in-network doctors . . . LabCorp executives repeatedly emphasized to their employees that the only purpose" of the agreement was to obtain pull-through business. (TAC ¶¶ 70-71.) For instance, in 2007, LabCorp's Chief Operating Officer explained that LabCorp entered into the agreement to obtain pull-through business, not UHC business, and that "if Lab-Corp did not obtain 'pull-through' business, LabCorp would lose its shirt and would not even be able to turn on the lights." (TAC ¶ 71.)

Further, at meetings between January and April 2007, LabCorp and UHC personnel met to discuss the success, to that point, of the parties' attempts to ensure that in-network doctors sent all patients—Government Program and UHC alike—to LabCorp. (TAC ¶¶ 74-76, 85-88.) These meetings took place at UHC's Manhattan office and were attended by named senior managers of UHC, as well as named personnel from LabCorp. (TAC ¶ 85.) At the meetings, participants would identify in-network doctors who were not sending sufficient numbers of tests to LabCorp, and UHC would visit and call those doctors to "recommend" that they send their business to LabCorp. (TAC ¶ 77.) Among those doctors discussed at the meetings were eleven doctors identified by last initial only, in five practice groups identified by number only located "in and around the New York City area." (TAC ¶ 83.) These practice groups initially "were not sending any 'pull-through' business to LabCorp," but following the meetings, UHC representatives contacted the practice groups and recommended that they refer all patients to LabCorp. (TAC ¶¶ 90-91.) By August 2007, those practice groups were "referring a significant amount of 'pull-through' business to LabCorp as a result of UnitedHealthcare's illegal recommendations," and LabCorp billed the Government Programs for that business. (TAC ¶¶ 92-94.)

4

## II. Procedural History

NPT filed its initial complaint in June 2007 and filed an amended complaint in August 2009, bringing additional claims on behalf of fourteen states and the District of Columbia. (ECF No. 1, 7.) It filed a second amended complaint in 2011 and its third amended complaint in July 2013. (ECF No. 16, 74.) LabCorp filed the instant motion to dismiss on September of that year. (ECF No. 79.) This Court issued a summary order granting LabCorp's motion on September 30, 2014. (ECF No. 92.) This Order discusses more fully the reasons for that decision.

## DISCUSSION

## I.      Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." Id. When considering a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. See Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010). However, the court need not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Iqbal, 556 U.S. at 678, 681 (citing Twombly, 550 U.S. 544). The complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & iStone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

In addition to the facial plausibility required by Rule 12(b)(6), complaints alleging violations of the False Claims Act must meet the heightened pleading standard imposed by Fed. R. Civ. P. 9(b).  Gold v. Morrison-Knudsen Co., 68 F.3d 1475, 1477 (2d Cir. 1995).  Rule 9(b) also applies to claims brought under state analogues of the FCA in federal court.  U.S. ex rel. Kester v. Novartis Pharm. Corp., 11 Civ. 8196 (CM), 2014 WL 4401275, at * 5 (S.D.N.Y. Sept. 4, 2014) (citing U.S. ex rel. Polansky v. Pfizer, Inc., No. 04 Civ. 704, 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009)). "The purpose of Rule 9(b) is threefold—it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991). Rule 9(b) requires a plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Their complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).

"Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the 'circumstances constituting fraud or mistake' that must be pled with particularity pursuant to Rule 9(b)." Polansky, 2009 WL 1456582, at *5 (quoting United States ex rel. Karvelas v. Melrose–Wakefield Hosp., 360 F.3d 220, 232 (1st Cir. 2004)). Plaintiffs must also link that scheme to "to allegations, stated with particularity, of the actual false claims submitted to the government that constitute the essential element of an FCA qui tam action." Id. While there is some disagreement over the level of detail that must be pled about each false claim, courts in this Circuit have generally required that plaintiffs "must plead the

submission of a false claim with a high enough degree of particularity that defendants can

reasonably identify particular false claims for payment that were submitted to the government."

U.S. ex rel. Kester v. Novartis Pharm. Corp., 23 F. Supp. 3d 242, 257-58 (S.D.N.Y. 2014)

(surveying approaches taken by various courts, discussing the Second Circuit's general approach

to fraud cases, and finding only one district court in the Second Circuit to have applied a less

stringent standard). In line with the weight of authority in this Circuit, to meet the pleading

standard here:

> "a relator must provide details that identify particular false claims for payment that were
> submitted to the government. In a case such as this, details concerning the dates of the
> claims, the content of the forms or bills submitted, their identification numbers, the
> amount of money charged to the government, the particular goods or services for which
> the government was billed, the individuals involved in the billing, and the length of time
> between the alleged fraudulent practices and the submission of claims based on those
> practices are the types of information that may help a relator to state his or her claims
> with particularity. These details do not constitute a checklist of mandatory requirements
> that must be satisfied by each allegation included in a complaint. However, ... some of
> this information for at least some of the claims must be pleaded in order to satisfy Rule
> 9(b)."

Ping Chen ex rel. U.S. v. EMSL Analytical, Inc., 966 F. Supp. 2d 282, 301 (S.D.N.Y. 2013)

(quoting Karvelas, 360 F.3d at 232-233).

Rule 9(b) may be "applied less stringently when the specific factual information is

peculiarly within the defendant's knowledge or control." In re Cardiac Devices Qui Tam Litig.,

221 F.R.D. 318, 334 (D. Conn. 2004); see also Wexner v. First Manhattan Co., 902 F.2d 169,

172 (2d Cir. 1990). However, relaxation of Rule 9(b) is not appropriate "[w]here the information

needed to fill out the complaint is in the hands of third parties," Polansky, 2009 WL 1456582, at

*8, and or where "relators were 'insiders' by virtue of the fact that they held directorships and/or

held privileges . . . and as such they had access to information upon which their claims depend."

U.S. ex rel. Lam v. Tenet Healthcare Corp., 481 F. Supp. 2d 673, 688 (W.D. Tex. 2006) (citing United States ex rel. Bartlett v. Tyrone Hosp., Inc., 234 F.R.D. 113, 114 (W.D.Pa. 2006)).

## II.    Analysis

Relator brings three claims under the False Claims Act, alleging (1) LabCorp knowingly presented and caused to be presented false or fraudulent claims for payment, in violation of 31 USC § 3279(a)(1); (2) LabCorp knowingly made, used, or caused to be made or used, false or fraudulent records of statements material to the payment of false or fraudulent claims, thereby causing false or fraudulent claims to actually be paid or approved, in violation of 31 USC § 3279(a)(2); and (3) LabCorp knowingly conspired with UnitedHealthcare and other Private Programs to commit acts in violation of 31 USC § 3279(a)(1) and (a)(2), itself a violation of 31 USC § 3279(a)(3). Relator also alleges violations of fifteen state law analogues to the FCA. Relator does not plead either its False Claims Act claims or its state law claims with the particularity required by Rule 9(b), and its claims cannot be saved by resort to any exception to Rule 9(b). Therefore, its claims are dismissed.

### A. Relator fails to plead the scheme with the requisite particularity.

For its claims to survive, NPT must plead both the alleged scheme and the specific false claims for payment with particularity. See Polansky, 2009 WL 1456582, at *4. It does neither.

As to the scheme, NPT does not provide sufficient detail of the "illegal side agreement" it alleges. (TAC ¶ 53.) At the heart of NPT's complaint are the alleged agreements under which Private Programs agreed to recommend LabCorp in exchange for discounted prices. Yet NPT fails to state with particularity the underlying schemes or agreements that constituted fraud or mistake. See Shields, 25 F.3d at 1128; Polansky, 2009 WL 1456582, at *4. NPT alleged that in 2007, LabCorp and UHC had meetings to "execute the second part of their fraudulent bargain.

At these meetings, LabCorp would provide information to United Healthcare about which doctors were not sending enough 'pull-through business to LabCorp." (TAC ¶ 76.) In the wake of these meetings, UHC would "recommend" to doctors in certain practice groups that they send their pull-through business to LabCorp. (TAC ¶¶ 77, 89.) But these meetings and recommendations were not illegal: though the allegations may identify the participants and state where and when the allegedly fraudulent statements were made, they do not state *why* they were fraudulent. Shields, 25 F.3d at 1128,

Indeed, NPT does not claim that these allegations amount to illegal behavior. Instead it argues, "If there was no side agreement, UHC would never have accepted, cared about, or known what to do with LabCorp's reports," giving rise to an inference of "the existence of an underlying (and presumably undocumented) *quid pro quo* between the parties." (Opp. at 11.) But Relator must allege "specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard" under Rule 9(b). Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990). Relator's allegations here give rise to no such strong inference. Instead, they could just as easily support an inference of legitimate business activity—that is, an agreement under which LabCorp secures exclusivity agreements in exchange for discounted prices, or directly or indirectly recommends that doctors send all their business to LabCorp absent inducement by remuneration. That there is a plausible and legal explanation for the alleged behavior sets this case apart from FCA cases where courts have found a strong inference of fraud. See, e.g., United States v. Huron Consulting Grp., Inc., No. 09 Civ. 1800 (JSR), 2011 WL 253259, at *3 (S.D.N.Y. Jan. 24, 2011) (finding a scheme adequately pled where defendants "fail[ed] to offer a convincing explanation for the seeming anomaly in [Medicare] outlier payments" at a hospital where charges increased by 75 percent, then dropped back to their

previous level once defendant no longer had control over the hospital). NPT does not

"specifically allege circumstances and events[] which would convert some of [defendant's]

seemingly legitimate activities into a fraudulent scheme. U.S. ex rel. Lam v. Tenet Healthcare

Corp., 481 F. Supp. 2d 689, 699 (W.D. Tex. 2007).

      Even if the alleged activities surrounding the agreement did give rise to a strong inference

of fraud, Relator does not sufficiently plead the contents of the agreement. Beyond repeated

references to the "illegal side agreement," NPT does nothing to "explain why the [claims] are

fraudulent." Shields, 25 F.3d at 1128. To meet this standard—thus giving Defendant adequate

notice and guarding against discovery fishing expeditions—NPT must describe the "illegal side

agreement" with some degree of detail and particularity. "A complaint that includes both

particular details of a scheme . . . and allegations making it likely bills were actually submitted

limits any 'fishing' to a small pond that is either stocked or dead." U.S. ex rel. Grubbs v.

Kanneganti, 565 F.3d 180, 191 (5th Cir. 2009). Yet NPT here sets no such limits, as it alleges

virtually no details as to the parameters, timing, or parties to the agreements.[1] A complaint must

do more than "offer[] sweeping and conclusory allegations of 'verbal agreements' . . . without a

shred of detail or particularity." U.S. ex rel. Nunnally v. W. Calcasieu Cameron Hosp., 519 F.

App'x 890, 894 (5th Cir. 2013).

**B. Relator fails to claims the scheme with the requisite particularity.**

      The claims themselves are likewise not pled with sufficient detail. To satisfy Rule 9(b),

the relator must "provide specific details identifying particular claims submitted to the

---

[1] See, e.g. TAC ¶ 6 ("LabCorp struck fraudulent bargains with *a number* of different Private Programs . . ."); TAC ¶ 53 (The parties would execute an agreement, but "*[t]he agreement would not, however, contain the illegal side agreement* . . ."); TAC ¶ 95 ("Upon information and belief, the kickback scheme between LabCorp and United Healthcare and the resulting false claims by LabCorp extended to *thousands of practice groups and individual doctors*"); TAC ¶ 97 ("As of June 2013, LabCorp has entered into *dozens of exclusive and preferred provider agreements* with various Private Programs"); Opp. at 3 ("From at least *as early as* 2007 through today, LabCorp has engaged in a single unified plan . . .") (emphasis added).

government," such as "details concerning the dates of claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, [and] the individuals involved in the billing." U.S. ex rel. Smith v. Yale Univ., 415 F. Supp. 2d 58, 85 (D. Conn. 2006) (quoting Karvelas, 360 F.3d at 232-233). This does not mean that Relator must provide each of these pieces of information, nor does it "mean that an FCA complaint will be dismissed unless the plaintiff identifies by claim number each and every individual claim that it contends was false." Kester, 23 F. Supp. 3d at 258. But Relator "must provide the defendant with enough details to be able to reasonably discern which of the claims it submitted are at issue." Id.

Relator does not meet that standard here. To identify specific claims, NPT pleads the price that LabCorp charged the Government Programs for two tests, as compared to the price it charged Private Programs, and identifies by number five practice groups of doctors in the New York area that allegedly sent Government Program business to LabCorp as a result of the alleged scheme. (TAC ¶¶ 67-68, 83-95). In addition, NPT refers to LabCorp's Annual Reports to show that LabCorp received substantial revenue from Government Programs in the years of the scheme. (Opp. at 13.) NPT contends that these three pieces of information comprise "the amount of money charged to the government, the particular goods or services for which the government was billed and the individuals involved in the billing." Id. (quoting Smith, 415 F. Supp. 2d at 85). While NPT may be correct on a literal level, its contention overlooks the very purpose of Rule 9(b): "to provide a defendant with fair notice of a plaintiff's claim." O'Brien, 936 F.2d at 676. Asserting, for instance, that LabCorp annually received between $744 million and $1.053 billion in revenue from billing Government Programs (Opp. at 13 n. 8) does not "provide the defendant with enough details to be able to reasonably discern which of the claims it submitted

are at issue." <u>Kester</u>, 23 F. Supp. 2d at 258. Similarly, describing price differences for two tests does not suffice to identify "particular goods or services for which the government was billed," as NPT presents those two tests as examples, leaving it ambiguous what other claims might be at issue. (TAC ¶¶ 67-68.) And identifying eleven doctors in the New York metropolitan area by their last initial combined only with a practice group number—itself not associated with any identifying information—does nothing toward helping LabCorp identify the claims at issue. Relator need not provide all the information listed in <u>Karvelas</u> to state a claim, nor does it need to identify each false claims by invoice or billing number, but it does need to provide Defendant with notice of the claims at issue, and its complaint falls short of that.

Indeed, Relator falls short even of the laxer standard that it urges the court to adopt. In a minority of circuits, "a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." <u>U.S. ex rel. Grubbs v. Kanneganti</u>, 565 F.3d 180, 190 (5th Cir. 2009); <u>see also</u> <u>U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.</u>, 579 F.3d 13, 29 (1st Cir. 2009) ("[A] relator could satisfy Rule 9(b) by providing 'factual or statistical evidence to strengthen the inference of fraud beyond possibility' without necessarily providing details as to each false claim.") But Relator here is lacking the "reliable indicia" or "evidence to strengthen the inference of fraud beyond possibility" that convinced other courts to proceed even where they did not allege details of an actually submitted false claim. For instance, in <u>Grubbs</u>, the court had in front of it a complaint alleging that doctors falsely recorded that they had performed specific services they never actually provided. 565 F.3d at 192. This constituted "more than probable, nigh likely, circumstantial evidence that the doctors' fraudulent records caused the hospital's billing system

in due course to present fraudulent claims to the Government." Id. There is no such inevitability to the scheme pled here, nor are the alleged claims as clearly identified, as they are not attached to dates or particular doctors. Under any standard, Relator fails to meet the particularity requirement for pleading false claims.

### C. Relator's State-Law Claims Do Not Meet the Rule 9(b) Standard.

The Rule 9(b) pleading standard applies equally to Relator's state-law claims. See U.S. ex rel. Kester v. Novartis Pharm. Corp., 11 Civ. 8196 (CM), 2014 WL 4401275, at * 5 (S.D.N.Y. Sept. 4, 2014). Courts have required that relators "allege some specificity with respect to each asserted state and cannot rely upon generalized pleadings." U.S. ex rel. Nowak v. Medtronic, Inc., 806 F. Supp. 2d 310, 357 (D. Mass. 2011); see also U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc., 906 F. Supp. 2d 1264, 1278 (N.D. Ga. 2012) (finding relator's complaint "provide[d] neither the level of detail nor indicia of reliability required to support his state-law claims against the identified state defendants," where relator drew an inference of a nationwide scheme from his experience in two local clinics and his receipt of national office memoranda); U.S. ex rel. Wall v. Vista Hospice Care, Inc., 778 F. Supp. 2d 709, 723 (N.D. Tex. 2011) (finding that specific facts plaintiff alleged relating to events in one state "cannot support by inference her general pleading, 'upon information and belief,' that similar frauds were also perpetrated in" four other states); Foglia v. Renal Ventures Mgmt., LLC, 830 F. Supp. 2d 8, 22 (D.N.J. 2011) (similar); U.S. ex rel. Harris v. Alan Ritchey Inc., No. C00-2191Z, 2006 WL 3761339, at *6 (W.D. Wash. Dec. 20, 2006) (similar). But see U.S. ex rel. Carpenter v. Abbott Labs., Inc., 723 F. Supp. 2d 395, 409 (D. Mass. 2010) (allowing "suit[] to proceed on a nationwide basis where specific facts are alleged involving a single representative state.").

NPT brings claims under the laws of fifteen states but does not allege specific facts relating to events in any state other than New York. This failure to "allege some specificity with respect to each asserted state," <u>Nowak</u>, 806 F.Supp. 2d at 357, is fatal to Relator's state law claims. While NPT does not dispute that it has not pled state-specific details, it argues, "Where a complaint alleges specific facts in a single representative state, 'ample precedent allows suits to proceed on a nationwide basis.'" (Opp. at 15 (quoting <u>Carpenter</u>, 723 F. Supp. 2d at 409).) Even if the Court were to adopt that minority view, "no such specific claims have been pled here as to *any* state." <u>Nowak</u>, 806 F. Supp. 2d at 357 (emphasis in original). In contrast, in <u>Carpenter</u>, the relator pled with sufficient detail its allegations as to false claims in Massachusetts, and it was those specifically pled allegations that supported its inference of a nationwide scheme and thus its state-law claims elsewhere. <u>Carpenter</u>, 723 F. Supp. 2d at 408-409. Where Relator has not sufficiently pled its allegations in any state, it would be illogical to allow those deficient allegations to support state-law claims. Because Relator does not meet the Rule 9(b) pleading standard for any of its allegations, its state-law claims must be dismissed.

### D. The Exceptions to the Rule 9(b) Standard Do Not Apply to Relator.

Finally, NPT argues that Rule 9(b) should be applied less stringently because "the specific factual information is peculiarly within the defendant's knowledge or control." (Opp. at 12 (quoting <u>Cardiac Devices</u>, 221 F.R.D. at 333).) However, this exception is inapplicable where the information necessary to plead the complaint is in the hands of third parties, <u>Polansky</u>, 2009 WL 1456582 at *8, or where the relators are "insiders" with access to the information on which their claims are based. <u>Lam</u>, 481 F. Supp. 2d at 688. For those reasons, Rule 9(b) should not be relaxed for NPT's complaint.

At the outset, Relator argues that the "specific factual information" necessary for the complaint is "exact details of the side agreement and specific submitted invoices." (Opp. at 12.) While it is plausible that the invoices are within the exclusive control of Defendant, the Court notes that these invoices are not the totality of "the information needed to fill out the complaint." Instead, as discussed above, Relator could make out a sufficiently specific claim by identifying, for example, parties involved, dates of transactions, and amounts of transactions. Karvelas, 360 F.3d at 232-233.

As for the "exact details of the side agreement," that information cannot be said to be "peculiarly within the defendant's knowledge or control." The information necessary to sufficiently plead the complaint was in possession not just of LabCorp but also of the current and former employees of the companies with whom LabCorp allegedly conspired and of the doctors who allegedly received the recommendation of LabCorp. The individual doctors, the private companies, and the former employees of LabCorp are not defendants in this suit. Rule 9(b) may be relaxed "where information is *only* within the opposing party's knowledge," not where third parties are alleged to have relevant information that is *also* in defendant's control. Yuhasz v. Brush Wellman, Inc., 341 F.3d 559, 566 (6th Cir. 2003) (emphasis in original); see also Polansky, 2009 WL 1456582 (noting that in Yuhasz, the Sixth Circuit "explicitly refused to relax Rule 9(b)'s pleading requirements where the facts are within the control of a third party" and commenting that a First Circuit case containing dicta apparently to the contrary conflated Rule 9(b) and the Rule 12(b)(6) facial plausibility standards). Although gathering the requisite details, here from potentially unfriendly parties, "may require investigation and research, such is the nature of Rule 9(b)." Smith, 415 F. Supp. at 83 (internal quotations omitted) (quoting Todd v. Oppenheimer & Co., 78 F.R.D. 415, 423 (S.D.N.Y. 1978)).

In addition, "relators were 'insiders' . . . and as such they had access to information upon which their claims depend." <u>Lam</u>, 481 F. Supp. at 688. The complaint claims that a member of NPT is a "former LabCorp sales executive" with "first-hand knowledge" of the allegations. (TAC ¶¶ 19, 82, 101.) NPT argues that refusing to relax the Rule 9(b) standard in this situation "is contrary to the reality that relators may come from any part of a corporations," and cites to <u>U.S. ex rel. Lusby v. Rolls-Royce Corp.</u>, 570 F.3d 849, 854 (7th Cir. 2009), for the proposition that "require[ing] an insider relator to have access to billing invoices at the pleading stage would only allow relators who worked in the accounting department, which would 'take a big bite out of <u>qui tam</u> litigation." (Opp. at 12 n. 5 (internal alterations omitted).) But this Court is requiring no such thing. The insider need not have access to billing invoices, but by virtue of his position as a former sales executive who was knowledgeable about meetings between LabCorp and Private Programs (TAC ¶ 72), he can fairly be expected to plead to the usual Rule 9(b) standard. Therefore, it is not appropriate to relax the pleading standard for NPT. Because the complaint does not meet the Rule 9(b) standard, it must be dismissed.

## CONCLUSION

For the reasons stated, Defendant LabCorp's Motion to Dismiss (ECF No. 79) is GRANTED. The Court will hold a status conference in this case **on December 2, 2015, at** 10:30 a **.m.** to discuss leave to amend and any other next steps in the proceedings. The parties (and/or counsel) should appear in person in Courtroom 1306 at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY, on the date and time specified above.

**SO ORDERED.**

**Dated:** November 17, 2015
      **New York, New York**

                                        **ANDREW L. CARTER, JR.**
                                       **United States District Judge**