USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 8/29/22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

UNITED STATES OF AMERICA, THE STATES OF DELAWARE, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MONTANA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, WISCONSIN, and THE DISTRICT OF COLUMBIA *ex rel.* NPT ASSOCIATES,

                       Plaintiff-Relator,

      v.

LABORATORY CORPORATION OF AMERICA HOLDINGS ET AL.,

                       Defendant.

---------------------------------------------------------- x

1:07-cv-05696 (ALC)

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

      Plaintiff-Relator NPT Associates ("NPT" or "Relator") brings this *qui tam* action against Defendant Laboratory Corporation of America Holdings ("LabCorp"), on behalf of the United States of America, as well as the States of Delaware, Hawaii, Illinois, Indiana, Louisiana, Montana, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Rhode Island, Tennessee, and Wisconsin, and the District of Columbia (the "States"), alleging in its Fourth Amended Complaint ("FAC" or "Complaint") that LabCorp violated the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq*. ("FCA") and its state equivalent laws ("State FCA laws") by (1) giving "kickbacks" to private insurance companies in the form of discounted lab testing rates and (2) charging Medicare and Medicaid programs prices "substantially in excess" of the prices it charges said private insurers. LabCorp now moves for dismissal of all claims pursuant to Fed. R. Civ. P.

1

9(b) and 12(b)(6). For the reasons set forth below, Defendant LabCorp's Motion to Dismiss (ECF No. 167) is **GRANTED**.

## BACKGROUND

### I. Factual Background

The following facts, alleged in the FAC, are assumed to be true for the purposes of this motion. The allegations are based on the direct and personal knowledge of a former LabCorp sales executive, Thomas Golubic, who is now a partner at NPT. FAC ¶ 47. Golubic served as Regional Director of Sales for LabCorp in Manhattan, the Bronx, and Staten Island from 2006 to 2008. *Id*. According to the FAC, "NPT's partners are professionals in the independent clinical laboratory business." *Id.* ¶ 10.

LabCorp is the second largest independent clinical laboratory company in the United States. *Id.* ¶ 13. LabCorp and its independent clinical laboratories provide analysis of human body specimens for patients referred to them by doctors. *Id.* ¶ 15. Referrals include both privately insured patients and those covered by Medicare and Medicaid (collectively, the "Government Programs"). *Id*. Because Government Programs provide generous reimbursement, pay more quickly and efficiently, and dispute fewer claims than private insurance programs ("Private Programs"), they are particularly sought after in the laboratory testing industry. *Id.* ¶ 16.

NPT alleges that LabCorp carried out a fraudulent scheme with Private Programs to increase its Government Program business. *Id.* ¶ 17. The scheme is as follows. First, LabCorp and the Private Program would enter into an agreement under which LabCorp would serve as the exclusive or preferred provider for patients insured by the private program, in exchange for LabCorp agreeing to discount the price of tests for those patients. *Id.* ¶ 61. The discounted prices were below the amount the Government Programs paid for the same tests. *Id*. The Private Program

would also influence its in-network doctors to send their Government Program-covered patients to LabCorp. *Id.* ¶ 63.

Second, LabCorp and the Private Program would execute their agreement; the agreement would reflect the exclusivity in exchange for heavily-discounted pricing but would not contain the "illegal referral agreement" under which the Private Program agrees to influence its in-network doctors to help LabCorp obtain "pull-through" business. *Id.* ¶¶ 3, 64. The FAC explains that "'pull-through' is a commonly used phrase for lucrative patient referrals consisting primarily of Government Program patient referrals." *Id.* ¶ 64.

Third, representatives of LabCorp and the Private Program would inform in-network doctors of the agreement and explain that these doctors were required to send all Private Program patients to LabCorp. *Id.* ¶ 68. Fourth, LabCorp tracked and shared information with the Private Programs about in-network doctors sending insufficient Government Programs patients to LabCorp for it to profit from the referral agreement. *Id.* ¶ 73. Using that information, at the fifth step, the Private Program would contact those in-network doctors and "pressure" them to use LabCorp for *all* testing. *Id.* ¶ 71. As the sixth and final step, LabCorp billed the Government Programs for patients referred by these doctors at rates substantially in excess of the rates billed to Private Programs. *Id.* ¶ 73.

NPT alleges that beginning in 2007, LabCorp carried out this scheme with UnitedHealth Group Incorporated ("UHC"). LabCorp agreed to provide testing services to UHC at below-cost prices that were 70 to 80 percent less than it charged Government Programs. *Id.* ¶ 61. LabCorp also agreed to pay UHC up to $200 million over three years for "transition costs related to developing an expanded network." *Id.* ¶ 62. LabCorp and UHC publicly announced this arrangement ("Exclusive Provider Agreement"), but did not disclose the "illegal referral

agreement" under which UHC would ensure "that LabCorp received referrals from UHC's in-network doctors of patients insured by Government Programs—sufficient referrals to allow LabCorp to recoup its losses on the UHC relationship and then to profit from it by virtue of the Government Programs' payments." *Id.* ¶ 63. LabCorp executives repeatedly emphasized to their employees that the only purpose of the agreement was to obtain this pull-through business. *Id.* ¶ 64. For instance, in 2007, LabCorp's Chief Operating Officer Donald Hardison explained that LabCorp entered into the agreement to obtain pull-through business from UHC's in-network doctors and that "if LabCorp did not obtain sufficient 'pull-through' business from [UHC], LabCorp would lose its shirt and would not even be able to turn on the lights." *Id*. NPT alleges that he also "advised the group that anyone who did not understand this should find another job." *Id*.

Further, between January and April 2007, LabCorp and UHC representatives held regular meetings with the purpose of ensuring that "both parties were benefiting from the Exclusive Provider Agreement." *Id.* ¶ 65. These meetings took place at UHC's offices at 1 Penn Plaza in Manhattan. *Id.* ¶ 69. Attendees included UHC Senior Managers Beth Ann Clark and Melissa, and William Crawford, Jeffrey Newman, and Chris Kabel of LabCorp. *Id*. Golubic also attended these meetings. *Id*.

At the meetings, participants would identify in-network doctors who were not sending sufficient numbers of UHC patient referrals to LabCorp. *Id.* ¶ 71. The two parties would then "pressure" these doctors "through in-person visits, telephone calls, and written communications to send all [UHC] patients to LabCorp." *Id*. By April 2007, most of UHC's in-network doctors were sending "substantially all of their UHC patients to LabCorp." *Id.* ¶ 72.

4

Once the two parties determined that in-network doctors were sending substantial numbers of UHC patients to LabCorp for testing, subsequent meetings from April to August 2007 were aimed at ensuring that these "doctors were sending enough Government Programs patients to LabCorp." *Id.* ¶ 73. In these meetings, "LabCorp personnel presented 'pull-through' reports" showing eleven doctors at five practice groups in New York who were sending insufficient numbers of Government Programs patients for LabCorp to recoup and profit from the agreement. *Id.* ¶¶ 73, 74. NPT has provided names, addresses, and identification numbers for these doctors. *Id.* ¶ 74. By August 2007, the named doctors were sending "a significant amount of 'pull-through' business (including Government Programs patients) to LabCorp . . . ." *Id.* ¶ 76. LabCorp then billed for the maximum amount allowed by the Government Programs for these tests. *Id.* ¶ 77.

## II.    Procedural History

NPT filed its initial complaint in June 2007 and its first amended complaint in August 2009, bringing additional claims on behalf of fourteen states and the District of Columbia. ECF Nos. 1, 7. NPT filed a second amended complaint in August 2011. ECF No. 18. In November 2011, LabCorp identified a possible conflict of interest held by NPT's former counsel. ECF Nos. 31, 33. In July 2013, NPT filed a third amended complaint pursuant to an agreement between the parties after NPT replaced its former counsel. ECF No. 74. Having investigated NPT's allegations, the United States government declined to intervene. In September 2013, LabCorp filed a motion to dismiss NPT's third amended complaint, which was granted by this Court in September 2014. ECF Nos. 79, 92. In January 2016, NPT filed a fourth amended complaint under seal. ECF Nos. 102, 103. The U.S. government again declined to intervene. ECF No. 154. The FAC remained under seal until October 2021. ECF No. 155. In February 2022, LabCorp filed the instant motion to dismiss. ECF. No. 167.

**LEGAL STANDARD**

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id*. When considering a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010). However, the court need not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678, 681 (citing *Twombly*, 550 U.S. 544). The complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 555).

In addition to the facial plausibility required by Rule 12(b)(6), complaints alleging violations of the False Claims Act must meet the heightened pleading standard imposed by Fed. R. Civ. P. 9(b). *See Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1477 (2d Cir. 1995). "The purpose of Rule 9(b) is threefold—it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The complaint must: "(1)

6

specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (internal quotation marks and citations omitted).

## DISCUSSION

NPT brings three claims under the False Claims Act, alleging that (1) LabCorp knowingly presented and caused to be presented false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(1); (2) LabCorp knowingly made, used, or caused to be made or used, false or fraudulent records of statements material to the payment of false or fraudulent claims, thereby causing false or fraudulent claims to actually be paid or approved, in violation of 31 U.S.C. § 3729(a)(2); and (3) LabCorp knowingly conspired with UHC and other Private Programs to commit acts in violation of 31 U.S.C. § 3729(a)(1) and (a)(2), itself a violation of 31 U.S.C. § 3729(a)(3). These claims hinge on LabCorp's allegedly fraudulent certifications that it was in compliance with the Anti-Kickback Statute (the "AKS"), 42 U.S.C. § 1320a-7b(b), and the "Substantially in Excess Prohibition", 42 U.S.C. § 1320a-7b(6)(A). NPT also alleges violations of state law analogues to the FCA.

The AKS prohibits offering "remuneration" to "induce" a person or company to purchase or recommend purchasing any good "for which payment may be made in whole or in part under a federal health care program." 42 U.S.C. § 1320a-7b(b)(2). The AKS does not apply to "a discount . . . obtained by a provider of services or other entity under a Federal health care program," so long as the "reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity." 42 U.S.C. § 1320a-7b(b)(3)(A). A claim including services "resulting from a violation of [the AKS] constitutes a false or fraudulent claim for

7

purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g). 42 U.S.C. The Substantially in Excess Prohibition gives the Secretary of Health and Human Services the discretion to exclude entities from participation in federal healthcare programs if they are found to have submitted bills or requests for payment "substantially in excess of . . . the entity's usual charges . . . unless the Secretary finds there is good cause" for the difference in price. 42 U.S.C. § 1320a-7(b)(6)(A). Misrepresentations about compliance with a statutory requirement like the Substantially in Excess Prohibition "must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Universal Health Servs., Inc. v. Unite States*, 579 U.S. 176, 192 (2016). The FCA defines materiality as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Grabcheski v. Am. Internat.Grp., Inc.*, 687 F. App'x 84, 87 (2d Cir. 2017) (citing *Universal Health Servs.*, 579 U.S. 176 at 193).

As the Court previously held in the opinion dismissing the Third Amended Complaint, NPT does not plead either its False Claims Act claims or its state law claims with the particularity required by Rule 9(b). For the below reasons, the FAC is dismissed.

I. **NPT FAILS TO PLEAD THE SCHEME WITH THE REQUISITE PARTICULARITY.**

For NPT's claims to survive under Rule 9(b), it must plead the alleged kickback scheme and specific false claims for payment with particularity. *See Chorches*, 865 F.3d at 81. NPT's Fourth Amended Complaint does not provide sufficient additional information to support an inference of a fraudulent agreement.

NPT fails to provide sufficient information to allow for a strong inference that LabCorp's exclusivity agreement with UHC included an "illegal side agreement" that constituted a kickback

8

scheme in violation of the AKS. As was the case with the previous complaint and as the Court held in its opinion dismissing the Third Amended Complaint, the facts alleged "could just as easily support an inference of legitimate business activity—that is, an agreement under which LabCorp secures exclusivity agreements in exchange for discounted prices, or directly or indirectly recommends that doctors send all their business to LabCorp absent inducement by remuneration." ECF No. 98 at 9.

Although this version of the Complaint does provide additional information to identify the doctors in question and participants in UHC/LabCorp meetings, NPT does not "specifically allege circumstances and events[] which would convert some of [the defendant's] seemingly legitimate activities into a fraudulent scheme." *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 689, 699 (W.D. Tex. 2007). Conclusory allegations that UHC representatives "pressured" in-network doctors without further detail describing *how* doctors were pressured and *what* was said to them fails to meet the requisite level of particularity. *See United States ex rel. Tessler v. City of New York*, No. 14 Civ. 6455 (JMF), 2016 WL 7335654, at *3 (S.D.N.Y. Dec. 16, 2016), *aff'd*, 712 F. App'x 27 (2d Cir. 2017) (holding that allegations that "fail to provide the who, what, when, where and how" are "too conclusory to satisfy Rule 9(b)" (internal quotation marks and citation omitted)); *Tenet Healthcare Corp.*, 481 F. Supp. 2d at 699 (dismissing FCA claims that lacked details about who offered remuneration to referring physicians or how referrals were induced).

II. **NPT'S CLAIMS REGARDING THE SUBMISSION OF FALSE CLAIMS AND THE SUBSTANTIALLY IN EXCESS PROHIBITION FAIL.**

NPT also fails to adequately plead the requisite particularity regarding submission of false claims. NPT does not "identify examples of actual claims." *Chorches*, 865 F.3d at 86. Nor does NPT puts forth "plausible allegations . . . that lead to a strong inference that specific claims were

9

submitted," the relaxed standard that applies if the Court determines that "details of the claims submitted are peculiarly within [LabCorp's] knowledge." *Id.* at 96.

To identify specific claims, NPT pleads the price that LabCorp charged the Government Programs for two tests, as compared to the price it charged UHC, and the Current Procedure Terminology ("CPT") codes for the types of tests. FAC ¶¶ 53-54, 57. NPT also identifies eleven doctors in New York that allegedly sent Government Program business to LabCorp as a result of the alleged scheme, FAC ¶¶ 74-77, and refers to LabCorp's Annual Reports to show that LabCorp received $7 billion in revenue from Government Programs in the years of the scheme, FAC ¶ 18. NPT then states that Labcorp can search its records using those eleven doctors' National Provider Identifier numbers and using the CPT code to determine how many claims were submitted after referrals from the doctors and to determine how many claims were submitted for performing the tests associated with the CPT codes as well as the prices charged. FAC ¶¶ 57,79.

First, the Court again holds that NPT has not adequately alleged that the particulars of the claims are exclusively held by LabCorp. *See* ECF No. 98 at 15. Courts in this Circuit refuse to relax the Rule 9(b) standard when the "[complaint] does not set[ ] forth facts establishing specific reasons why [the] information [contained in] the particular bills that were submitted for reimbursement is peculiarly within [Defendants'] knowledge." *United States ex rel. Gelbman v. City of New York*, 790 F. App'x 244, 248 (2d Cir. 2019) (internal quotation marks and citations omitted). While the Complaint states that LabCorp could locate the relevant claims by using the information provided by NPT, such an assertion is not an allegation that the missing details are "uniquely within AMR's knowledge and control." *Chorches*, 865 F.3d at 83. Therefore, the relaxation of the pleading standard is not appropriate here.

10

NPT fares no better under the traditional Rule 9(b) standard because the Complaint does not provide any specific examples of fraudulent claims. NPT alleges that "LabCorp has submitted hundreds of thousands of claims to the Government Programs that violated the Substantially in Excess Prohibition and were a result of the kickback scheme," but NPT offers no examples of such claims. FAC ¶ 82. These allegations constitute "merely general or conclusory" assertions that cannot satisfy the Rule 9(b) standard. *Chorches*, 865 F.3d at 84. NPT need not identify *each* false claim by invoice or billing number, but it must at least identify representative examples of the alleged false claims to "provid[e] a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Id*. at 86.

Additionally, the difference in price charged to UHC and Government Programs alone does not allow for a strong inference of false claims. At the very least, NPT must plead that LabCorp charged Government Programs prices "substantially in excess of . . . [their] *usual* prices." 42 U.S.C. § 1320a-7(b)(6)(A) (emphasis added). And even then, NPT must also provide proof of materiality of the statutory price requirement to state a claim under the FCA. *Universal Health Servs.*, 579 U.S. at 192. NPT alleges that LabCorp charged Government Programs 400% more than it charged UHC for a comprehensive metabolic panel test and 1000% more for a blood count test. FAC ¶¶ 53, 54. A showing of higher prices for Government Programs in comparison to prices for Private Programs with whom LabCorp has exclusive provider agreements in exchange for discounts does not show prices in excess of LabCorp's *usual* prices. NPT claims that LabCorp's "discounted prices have become [its] *de facto* usual prices" because these agreements make up a "significant portion of [its] business," but it provides no support for this allegation or details for agreements other than that with UHC. FAC ¶ 47.

Thus, NPT's pleadings are insufficient to show that LabCorp made fraudulent claims in certifying that it was in compliance with applicable regulations, such as the Substantially in Excess Prohibition. *Universal Health Servs.*, 579 U.S. at 192. Even if NPT did provide details about LabCorp's usual prices to show a violation of the Substantially in Excess Prohibition, it does not give any explanation of whether such a violation would be material in the context of the FCA. *Id.* ("[M]isrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act.").

Therefore, the FCA claims must be dismissed.

### III.   The Court declines to exercise jurisdiction over the state law claims.

I decline to exercise jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3) (providing that the district court "may decline to exercise supplemental jurisdiction" once the court "has dismissed all claims over which it has original jurisdiction"). "In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998); *see, e.g.*, *United States ex rel. Vierczhalek v. MedImmune, Inc.*, 345 F. Supp. 3d 456, 466 (S.D.N.Y. 2018) ("Given the dismissal of [Plaintiff-Relator]'s federal [FCA] claim at this early stage of litigation, the Court declines to exercise supplemental jurisdiction over her remaining state law claims . . . ."), *aff'd sub nom. Vierczhalek v. MedImmune Inc.*, 803 F. App'x 522 (2d Cir. 2020); *United States ex rel. JDJ & Assocs. LLP v. Natixis*, No. 15 Civ. 5427 (PKC), 2017 WL 4357797, at *11 (S.D.N.Y. Sept. 29, 2017) ("Having dismissed [Plaintiff-Relator]'s claims under the FCA, the Court declines to exercise supplemental jurisdiction over [Plaintiff-Relator]'s state law claims."). As the Court has dismissed all federal claims, the Court declines to exercise supplemental jurisdiction over the state law claims.

## CONCLUSION

For the reasons stated, Defendant LabCorp's Motion to Dismiss, ECF No. 167, is GRANTED. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 167 and close this case.

**SO ORDERED.**

**Dated:**   New York, New York
　　　　　　August 29, 2022

　　　　　　　　　　　　　　　　　　　　　　　　　　　　**ANDREW L. CARTER, JR.**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　**United States District Judge**